Filed 12/14/22  P. v. Compton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079422 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F00909) |
| v. | |
| CHRISTOPHER COREY COMPTON, | |
| Defendant and Appellant. | |

In this special circumstance murder case, defendant Christopher Corey Compton joined his friend and codefendant, Jazz Curry, in committing an armed robbery in the parking lot of an apartment complex where two of their friends lived.  According to defendant, who was relatively forthcoming both during his interview with detectives and during his trial testimony, he did not want to participate in the robbery and tried to get out of it, but ultimately felt he had to do so because he was afraid of saying no to Curry.  The victim was Tralane Thomas, from whom Curry purchased marijuana earlier in the day.  That evening, Curry called Thomas to set up another buy.  When Thomas arrived to make

1

the sale, he reached for his waistband. At the same time, Curry pulled out a loaded handgun, and defendant also pulled an unloaded shotgun from his pant leg. Thomas then put his hands up as Curry grabbed a necklace from his neck and fired two fatal rounds into his chest. Defendant ran as Thomas fell to the ground. Curry took the handgun Thomas had in his waistband and also ran. Defendant and Curry then spent the night in separate apartments because defendant was mad at Curry, both for killing Thomas and for involving defendant in the robbery.

Defendant and Curry were tried together before separate juries. This appeal involves only defendant. He was convicted of first degree murder (Pen. Code, §§ 187, 189)[1] and robbery (§ 211) and found to have personally used a firearm during the commission of both offenses (former § 12022.53, subd. (b)). With respect to the murder, the jury found true a robbery-murder special-circumstance allegation (§ 190.2, subd. (a)(17)). Defendant was sentenced to serve an indeterminate prison term of life without the possibility of parole.[2]

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Trial occurred between November 2014 and May 2015. Defendant's notice of appeal was filed in June 2015. The initial record on appeal was filed in January 2018. However, various requests to supplement/augment the record resulted in suspension of time for briefing until September 2019. Thereafter, this court granted defendant's former appellate counsel many extensions of time to file the opening brief. That brief was filed in December 2020. Multiple extensions of time were also granted to the Attorney General, who filed the respondent's brief in August 2021. Finally, after two extensions of time were granted to defendant's former appellate counsel to file the reply brief, no reply brief was filed. Then, having discovered a potentially meritorious issue not raised in the opening brief despite the many extensions of time granted, we asked the parties for supplemental briefing on what impact, if any, our Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*) have on the sufficiency of the evidence supporting defendant's special circumstance finding. The Attorney General filed a supplemental letter brief in February 2022. No supplemental brief was received by defendant's former appellate counsel. Thereafter, this court relieved that attorney from

On appeal, defendant contends: (1) the evidence is insufficient to support his felony-murder conviction because the evidence does not support newly enacted requirements that defendant was a major participant in the robbery, and that he acted with reckless indifference to human life, as those requirements are elucidated in *Banks*, *supra*, 61 Cal.4th 788, *Clark*, *supra*, 63 Cal.4th 522, and *Scoggins*, *supra*, 9 Cal.5th 667; (2) the trial court prejudicially erred and violated defendant's federal constitutional rights by denying a defense request to instruct the jury on the defense of duress; (3) trial counsel provided constitutionally deficient assistance by pursuing a duress defense without first determining whether or not the trial court would instruct the jury on that defense; (4) the trial court prejudicially erred and also violated defendant's constitutional rights by (a) declining to instruct the jury that a lack of motive may support a not guilty verdict, and (b) allowing the prosecutor to play defendant's police interview for the jury a second time in its entirety; (5) the cumulative prejudicial impact of the foregoing assertions of error requires reversal; and (6) we must remand the matter for a new sentencing hearing because Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), which became effective January 1, 2018, applies retroactively to cases not yet final on appeal.

We conclude the evidence does not support a finding that defendant acted with reckless indifference to human life. We must therefore vacate the special circumstance finding for insufficient evidence, a conclusion that precludes retrial as to that allegation. We must also reverse the felony-murder conviction. However, because the elements of major participation and reckless indifference to human life were added to the crime of felony murder after defendant's trial, ordinarily retrial would be permitted to provide the

_____

representing defendant and appointed successor appellate counsel to file the requested supplemental brief. After additional extensions of time were granted to allow new counsel to review and further augment the record, defendant's supplemental brief was filed in August 2022, at which point the case became "fully briefed," more than seven years after the notice of appeal was filed.

3

prosecution with an opportunity to prove the new elements. In other words, such an error is usually treated as one of instructional error rather than insufficiency of the evidence.[3] Here, however, the prosecution already had an opportunity to prove these elements, in connection with the special circumstance allegation, and failed to do so. In this situation, we also reverse the felony-murder conviction for insufficient evidence.[4]

We address defendant's remaining claims solely with respect to their effect on the robbery conviction and conclude as follows: the trial court did not err in declining to instruct on the defense of duress because that defense was not supported by substantial evidence; trial counsel did not provide constitutionally deficient assistance; assuming the trial court erred in the other two respects urged above, these errors were harmless whether considered individually or cumulatively; and finally, we must remand the matter for an exercise of Senate Bill 620 discretion.[5]

FACTS

In January 2012, Thomas often stayed over at his girlfriend's apartment in Sacramento. They were in the process of looking for an apartment together. Thomas sold marijuana and routinely carried cash. The night before he was killed, his girlfriend watched him count about $1,000 in cash. He carried that money in his pocket on the day he was killed, Monday, January 30.

---

[3]    Defendant also argues reversal of the murder conviction is required because the jury was not instructed on the new requirements.

[4]    These conclusions make it unnecessary to address two additional arguments raised in defendant's supplemental brief, specifically, ineffective assistance of trial counsel for failing to present a defense to the special circumstance allegation based on a failure to prove these requirements, and defendant's sentence of life without parole violates the Eighth and Fourteenth Amendments.

[5]    Defendant also raises various sentencing error claims, none of which need be addressed in this opinion in light of our disposition remanding the matter for a new sentencing hearing.

4

On that day, before setting out to do some apartment hunting, Thomas asked to borrow his girlfriend's cellphone and brought it outside to his car, a Cadillac that was parked in front of an adjacent apartment building. As Thomas sat in the driver's seat with the door open, defendant and Curry walked past the car. Thomas said something that caused them to turn around. After a brief greeting, Curry asked: "Do you know anybody who sells weed?" Thomas answered: "Yeah, I got it." Thomas then sold Curry some marijuana. While defendant did not participate in the transaction, he saw that Thomas "had like a lot" of the substance. As defendant and Curry walked away from the Cadillac, Curry asked defendant whether he had "seen the weed" and "how much money he had." Curry then said he wanted to rob him.

Before describing how Curry went about setting up the robbery that would end Thomas's life, we take a brief detour into how defendant and Curry came to be in that parking lot in the first place. Defendant and Curry lived in Richmond. Defendant was 18 years old. Curry was about the same age. On the Friday night before the murder, they went to a party in Concord, where they ran into Larron Peterson and Jammell Harris. Peterson and Harris were also from Richmond, but lived in Sacramento, in separate apartments in the same apartment complex where Thomas's girlfriend lived. They were about four years older than defendant, who looked up to them as big brother figures. They both attended Sacramento City College.

After the party in Concord, which ended abruptly because of an unrelated fight that escalated into a shooting, defendant found out that the person who drove him and Curry to the party had already left. He asked Peterson for a ride back to Richmond. Peterson said he was going to Sacramento, but defendant and Curry could join him. They agreed, primarily because there were "three or four girls" in Peterson's car. In all, about seven people piled into the car to head to Sacramento. Harris left the party separately with his brother, a friend named Joseph Potter, and two girls. They also drove to Sacramento.

5

Defendant and Curry stayed at Peterson's apartment over the weekend, but also spent some time at Harris's apartment. Peterson was "in and out" of the apartment all weekend.

On Monday, the day of the murder, defendant and Curry were in Peterson's apartment with some of Peterson's friends. Peterson was not home. Someone asked defendant and Curry whether they smoked marijuana. They said they did, but no one in the apartment had any, so either defendant or Curry asked: "Don't nobody sell weed around here?" No one knew where to get some, so defendant and Curry decided to leave the apartment on foot in search of someone who sold the substance. This was when they ran into Thomas in the Cadillac. In addition to buying the marijuana from Thomas, Curry also took down the number for Thomas's girlfriend's cell phone. As previously mentioned, after making the purchase, on their way back to Peterson's apartment, Curry expressed interest in the amount of marijuana and money Thomas had and told defendant that he wanted to rob him.

Back at Peterson's apartment, they smoked the marijuana with Peterson's friends and Curry again brought up robbing Thomas. According to defendant, he initially thought Curry was joking, but realized he was serious the more he talked about it. During the course of the day, Peterson and Potter, who also attended Sacramento City College, came in and out of the apartment; they apparently had class that day. Curry did not discuss his plan to rob Thomas while they were there.

That evening, Peterson, Harris, and Potter had plans to meet up with some girls at a different apartment complex a short distance away. They met at Harris's apartment sometime before 6:00 p.m. Peterson brought defendant and Curry over to Harris's apartment, but they were not part of the plan to meet up with the girls. Two other friends of Peterson and Harris were also there, one of whom defendant knew as "Tone." Defendant claimed he did not know the other person's name, but referred to him as "Rob" later in his testimony. We also refer to them by these names.

6

At Harris's apartment, Curry again brought up robbing Thomas. The plan was simple. Curry said he would call Thomas to buy some more marijuana, and "once he came outside, he was gonna rob him." Curry said that defendant was going to participate and wanted to know who else was in. According to defendant, he never agreed to rob Thomas, and did not understand why Curry said he would, but defendant also did not dispute Curry's statement. Peterson responded to Curry's inquiry with: "I have a daughter. I'm not doing this." Potter said he was also out because, as he put it, "I don't even know y'all." As defendant explained during his trial testimony, because people "began giving excuses" as to why they could not participate, he thought he also needed an excuse, so he said: "I don't have a gun. I'm not going." In response, Potter retrieved a shotgun from Harris's closet and gave it to defendant, who then said he "didn't want any bullets in the shotgun" if he was going to participate. Potter then showed defendant it was unloaded and handed the shotgun back to him.[6] Harris did not say anything during the conversation. Tone also kept quiet, while Rob indicated he would participate.[7]

About thirty minutes later, defendant, Curry, Tone, and Rob went back to Peterson's apartment while Peterson, Harris, and Potter went to meet up with the girls. Curry told defendant and the others where to stand when Thomas came outside for the purported marijuana buy and then asked whether everyone was ready. Defendant did not

---

[6]     Potter denied this during his testimony. He claimed he saw a shotgun in Harris's closet on Sunday when he was putting a blanket away. After picking the weapon up, defendant saw the shotgun and said, "Hey, let me see that." Potter then gave defendant the gun and went into Harris's bedroom. Potter also testified that he stopped by Peterson's apartment to pick up a sweatshirt on the same day. While he did not see defendant or Curry there, he claimed he overheard their voices in another room "talking about robbing somebody."

[7]     Defendant testified that he felt "[b]etrayed" by Harris and Peterson because he viewed them as older brother figures and, as defendant put it, "for them to sit there and go along with this and not even try to stand up for me or speak up for me, it hurt."

say anything, but the other two said they were and walked out of the apartment with Curry. Defendant stayed behind. As he explained during both his trial testimony and statement to police, defendant hoped they would "get the hint" that he did not want to be involved, but a short time later, Curry called defendant and said: "Come on, I'm waiting on you," and "Don't be a little bitch."[8] Defendant then joined Curry and the other two outside. Defendant had the unloaded shotgun in his pant leg; Curry was armed with a loaded .40-caliber handgun.

Meanwhile, Thomas and his girlfriend spent the afternoon looking at apartments. They returned to her apartment at about 6:00 p.m. When they got back, Thomas's girlfriend saw that she had three missed calls. These calls were from Curry. When she called the number back, Curry answered and asked to speak to Thomas. After handing the phone to Thomas, she was able to hear Curry ask for "an eighth of weed." Thomas said "okay." He then bagged up the marijuana and retrieved a .38-caliber handgun from his car. About 30 minutes later, Thomas's girlfriend received another call from Curry, again gave the phone to Thomas, and heard Curry say that he "would be waiting outside by his car." Before heading outside to make the sale, Thomas told his girlfriend that he "didn't really trust these guys," but he "needed to go make some money." Within two minutes of Thomas walking outside, his girlfriend heard yelling and multiple gunshots. She ran outside to find Thomas's motionless body on the ground next to his car.

As defendant described the robbery murder during his statement to detectives, Curry was standing behind Thomas's car when defendant walked out to join him. Tone was looking inside a window of Thomas's girlfriend's apartment, "to see how many dudes is in there," and then walked over to a curb to wait for the robbery to conclude.

---

**8** There is evidence that defendant is the one who made the call to Curry. However, regardless of who made the call to whom, there is no evidence contradicting defendant's account of what was said.

When defendant got to the car, Curry made the call to tell Thomas to come outside. Moments later, Thomas walked over to the car to make the sale. As Thomas approached, he reached for his waistband. Curry then pulled out his handgun and defendant also pulled out the shotgun. Defendant could see the handle of Thomas's gun when he did so. Instead of pulling out his gun, Thomas put his hands up. Curry then said "give me this," grabbed a necklace from Thomas's neck, extended his handgun, and fired two rounds into Thomas's chest.

Defendant ran when the first round was fired, but heard additional rounds being fired as he ran. Curry also ran after shooting Thomas, but not before taking his gun. Defendant and Curry ran towards the back of the apartment complex and eventually went to Harris's apartment, where defendant left the shotgun. We need not recount their subsequent activities, except to note that Curry stayed at Harris's apartment that night, while defendant stayed at Peterson's apartment. As defendant explained during his trial testimony, he was angry at Curry for shooting Thomas and for involving defendant in the robbery.

Meanwhile, police and emergency medical personnel arrived at the crime scene. Thomas was dead upon their arrival. He died of two gunshot wounds to the chest, either of which would have been fatal, and both of which were fired from less than an inch away. A third gunshot wound was also inflicted to Thomas's left arm. Consistent with these autopsy findings, and defendant's account of events, three .40-caliber shell casings were found near Thomas's body. A small plastic bag containing marijuana was also found near his body. A small amount of cash was found in Thomas's pant pocket and a gold necklace was found in a pool of blood after the body was rolled over.

After talking to Thomas's girlfriend, police were able to track the cell phone Curry used to set up the marijuana buy to Harris's apartment, where Curry was arrested the following morning. Curry's .40-caliber handgun, the .38-caliber handgun he took from Thomas, magazines and ammunition for each, and the shotgun used by defendant during

the robbery, were recovered during a search of that apartment. A subsequent ballistics analysis confirmed the .40-caliber handgun fired the shell casings recovered from the crime scene. Curry's fingerprints were also found on that weapon.

Defendant, who received a ride back to Richmond the day after the murder, was arrested the following month. He was thereafter interviewed by detectives, and after initially claiming he and Curry were simply trying to buy marijuana from Thomas, confessed to participating in the robbery that resulted in Thomas's death.

DISCUSSION

## I

### *Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his felony-murder conviction because the evidence does not support newly enacted requirements that defendant was a major participant in the robbery, and that he acted with reckless indifference to human life, as those requirements are elucidated in *Banks*, *supra*, 61 Cal.4th 788, *Clark*, *supra*, 63 Cal.4th 522, and *Scoggins*, *supra*, 9 Cal.5th 667. Without deciding whether the evidence supports a finding that defendant was a major participant, we conclude the evidence falls short of establishing reckless indifference to human life.

### A.

### *Changes in the Legal Landscape Applicable to this Issue*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) As amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015, § 2), effective January 1, 2019, section 188 provides in relevant part: "[M]alice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of

10

murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a).)

Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] robbery." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice.  At the time of defendant's trial, prior to Senate Bill 1437, " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)

Effective January 1, 2019, Senate Bill 1437 amended the felony-murder rule to provide, in relevant part:  "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2" (§ 189, subd. (e).)

Thus, at the time of defendant's trial, the only mental state required for conviction of first degree felony murder was defendant's intent to commit the robbery against Thomas.  Now, since defendant was not the actual killer and did not intend to kill Thomas, in order to convict him of felony murder, the prosecution was required to prove that he was a major participant in the robbery and acted with reckless indifference to human life.  However, as alluded to in section 189, subdivision (e), proof of these major participant and reckless indifference elements was already required to prove the felony-murder special circumstance set forth in section 190.2, subdivision (d), found true by the

11

jury in this case.[9] But what was not clear at the time of defendant's trial was the scope of the major participant and reckless indifference elements. Our Supreme Court clarified that scope in *Banks* and *Clark*, and provided further guidance in *Scoggins*, discussed in detail below. (See *People v. Strong* (2022) 13 Cal.5th 698, 703 [*Banks* and *Clark* "for the first time provided substantial guidance on the meaning of the two relevant statutory phrases"].)

As noted previously, we asked the parties for supplemental briefing on what impact, if any, these decisions have on the sufficiency of the evidence supporting defendant's special circumstance finding. We directed the question towards the special circumstance finding because it was settled that the changes to the law made by Senate Bill 1437 did not apply retroactively on direct appeal. (See *People v. Gentile* (2020) 10 Cal.5th 830, 851-852 ["ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective"].) Thus, while defendant could challenge the special circumstance finding on direct appeal as unsupported by substantial evidence following *Banks*, *Clark*, and *Scoggins*, he could not challenge his murder conviction based on Senate Bill 1437's changes to the felony-murder rule.

Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775) (Stats. 2021, ch. 551, § 2), effective January 1, 2022, changed this by amending former section 1170.95 to allow "[a] person convicted of murder, attempted murder, or manslaughter

---

**9** This subdivision provides, in relevant part, "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (d).)

12

whose conviction is not final [to] challenge on direct appeal the validity of that conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437." (Former § 1170.95, subd. (g); Stats. 2021, ch. 551, § 2.)**10** In light of this new enactment, defendant focuses his supplemental brief on the validity of his felony-murder conviction, rather than the special circumstance finding, arguing this conviction is unsupported by substantial evidence, and in the alternative, reversal is also required because the jury was not instructed on the new major participation and reckless indifference elements.

Regardless of whether sufficiency of the evidence, or rather instructional error, is the proper vehicle for defendant's challenge to his felony-murder conviction (see *People v. Hola* (2022) 77 Cal.App.5th 362, 373 (*Hola*) [rejecting the argument that "the Legislature intended to allow challenges for insufficiency of the evidence in allowing defendants to 'challenge on direct appeal the validity' of their murder conviction under the Senate Bill 1437 amendments"]), we must nevertheless assess the sufficiency of the evidence supporting the special circumstance. Specifically, does the evidence support a finding that defendant was a major participant who acted with reckless indifference to human life, as those statutory phrases were clarified in *Banks*, *Clark*, and *Scoggins*? We now discuss those decisions.

## B.

### Banks, Clark, *and* Scoggins

In *Banks*, *supra*, 61 Cal.4th 788, our Supreme Court interpreted section 190.2, subdivision (d), explaining that subdivision "was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum,

---

**10** Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

13

with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 794.) Beginning with *Enmund*, our Supreme Court explained the high court reversed a death sentence where the defendant, Enmund, was the getaway driver in a planned armed robbery that resulted in the unplanned murder of the robbery victim and his wife. "The court found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.] Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' [Citation.] The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' [citation], a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' [citation] cannot constitutionally be sentenced to death." (*Id*. at p. 799.)

Turning to *Tison v. Arizona*, *supra*, 481 U.S. 137 (*Tison*), our Supreme Court explained the high court upheld death sentences where the defendants, Ricky and Raymond Tison, along with a third brother, "helped plan and carry out the escape of two convicted murderers from prison," including their father, Gary Tison, who "was serving a life sentence for killing a guard in the course of a previous escape." (*Banks*, *supra*, 61 Cal.4th at p. 802.) The Tison brothers brought "a cache of weapons to prison, arm[ed] both murderers, and [held] at gunpoint guards and visitors alike." (*Ibid*.) "During the subsequent escape, their car, already down to its spare tire, suffered another flat, so [they] agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and [the third brother] drove the family into the desert in the Tisons' original car with the others following. Ricky and [his father's] cellmate

14

removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members." (*Id*. at p. 799.)

After "endorsing *Enmund*'s holding that the Eighth Amendment limits the ability of states to impose death for 'felony murder *simpliciter*[,]' . . . *Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme were actual killers and those who attempted or intended to kill. [Citation.] Under *Enmund, Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. [Citation.] The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.' [Citation.] Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' [Citation.] This is the language the electorate codified in section 190.2[, subdivision ](d)." (*Banks*, *supra*, 61 Cal.4th at p. 800.)

Elaborating on the actus reas requirement of major participation, our Supreme Court endorsed a "gloss" placed on that phrase by this court in *People v. Proby* (1998) 60 Cal.App.4th 922, i.e., "that a defendant must have been actively and substantially involved in the events leading up to a murder," but further explained: "A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks*, *supra*, 61 Cal.4th at p. 801.) The court then set forth the following factors to be used in determining whether or not a "defendant's participation 'in criminal activities known to carry a grave risk of

15

death' [citation] was sufficiently significant to be considered 'major' [citations]" under section 190.2, subdivision (d): "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question . . . ." (*Banks,* at p. 803, fn. omitted.)

Applying this multifactor test to the facts in *Banks*, the court held the evidence was not sufficient to support a robbery-murder special-circumstance finding as to one of the defendants, Matthews, who was the getaway driver for an armed robbery during which another defendant, Banks, shot and killed one of the robbery victims. (*Banks*, *supra*, 61 Cal.4th at pp. 804-805.) The court explained: "The evidence in the record places Matthews at the *Enmund* pole of the *Tison–Enmund* spectrum. Indeed, as Matthews argues, his conduct is virtually indistinguishable from Earl Enmund's. No evidence was introduced establishing Matthews's role, if any, in planning the robbery. No evidence was introduced establishing Matthews's role, if any, in procuring weapons. Matthews and two confederates—though not the shooter—were gang members, but, in contrast to the convicted murderers the Tison brothers chose to free and arm, no evidence was introduced that Matthews[ or these confederates] had themselves previously committed murder, attempted murder, or any other violent crime. The crime itself was an armed robbery; *Enmund* and *Tison* together demonstrate that participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death.' [Citation.] During the robbery and murder, Matthews was absent

16

from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Id*. at p. 805, fn. omitted.) The court concluded that "Matthews was, in short, no more than a getaway driver, guilty like Earl Enmund of 'felony murder *simpliciter*' [citations] but nothing greater," and therefore, "the evidence was insufficient to . . . find the special circumstance true." (*Ibid*.)

Finally, with respect to the mens rea requirement of reckless indifference to human life, the court explained that "*Tison,* and in turn section 190.2[, subdivision ](d), look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.) Holding the evidence was also insufficient to establish this mental state, the court explained: "There was evidence from which the jury could infer Matthews knew he was participating in an armed robbery. But nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew *his own actions* would involve a grave risk of death. There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund,* Banks's killing of [the victim] was apparently a spontaneous response to armed resistance from the victim." (*Id*. at p. 807, italics added.)

In *Clark*, *supra*, 63 Cal.4th 522, our Supreme Court vacated special circumstance findings where the defendant was not merely guilty of felony murder *simpliciter*, but was rather "the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Id*. at p. 612.) There, the defendant and his brother and cousin conducted surveillance of a computer store, studying the number of employees and their activities around closing time. Defendant also secured use of a U-Haul truck by having another person rent the truck using a false driver's

17

license defendant helped her procure. (*Id*. at pp. 536, 612.) The plan was for one man, Ervin, to enter the store around closing time with a gun, which was "apparently [supposed] to be unloaded," and handcuff the remaining employees in the restroom so no one could call the police. (*Id*. at p. 613, fn. omitted.) Then, while defendant sat in the parking lot in a BMW, his brother and another man, who apparently believed the store belonged to defendant, were to help Ervin remove computers from the store and load them into the U-Haul, which was parked nearby. However, before any computers could be removed, the mother of one of the handcuffed employees came into the store. Ervin shot her in the head and fled to defendant's car. Defendant drove away, leaving Ervin to be arrested in the parking lot by an officer who heard the gunshot while on patrol near the store. The gun Ervin used to murder the victim had been loaded with one bullet. (*Id*. at pp. 536-538, 613.)

Beginning with "the *Banks* factors concerning major participation," the court stated: "[W]e can conclude that defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of [the victim]. No evidence was presented about defendant's role in supplying the weapon, although inferences can be drawn from [the evidence] that use of a weapon was part of his plan for the robbery. No evidence was presented about defendant's awareness of the particular dangers posed by the crime, beyond his concern to schedule the robbery after the store's closing time. No evidence was presented about his awareness of the past experience or conduct of Ervin, the shooter. Defendant was in the area during the robbery, orchestrating the second wave of the burglary after Ervin secured the store, but defendant was not in the immediate area where Ervin shot [the victim]." (*Clark*, *supra*, 63 Cal.4th at pp. 613-614.) The court then noted that it previously upheld a major participant finding where "the defendant, although not present at the murder, was 'the founder, ringleader and mastermind behind' a criminal gang engaged in carjacking," and gave "his subordinate gang members . . . 'a carjacking tutorial and instructed them that a resisting victim was to

18

be shot.' " (*Id*. at p. 614, quoting *People v. Williams* (2015) 61 Cal.4th 1244, 1281.) However, the court declined to decide whether or not the defendant qualified as a major participant under the *Banks* factors, concluding instead "the evidence was insufficient to support that he exhibited reckless indifference to human life." (*Clark,* at p. 614.)

Before assessing the evidence supporting this mens rea element, the court noted the two elements are interrelated such that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Tison*, *supra*, 481 U.S. at p. 153.) At the same time, even significant participation in an armed robbery does not necessarily entail possession of that mental state. (*Clark,* at pp. 616-617.) Instead, the reckless indifference defined in *Tison* "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id*. at p. 617.) The court then explained that the Model Penal Code's definition of recklessness contains subjective and objective elements: "The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Ibid*.)

The court then applied the following factors to the facts before it in determining whether or not the defendant was recklessly indifferent to human life within the meaning of section 190.2, subdivision (d): Did the defendant know a gun would be used and/or personally use a gun during the robbery? Was the defendant physically present at the scene of the murder, and therefore provided with an opportunity to restrain the murderer or aid the victim? What was the duration of the interaction between the perpetrators and the victims? Did the defendant have knowledge of his or her cohort's likelihood of killing? Did the defendant apparently take steps to minimize the risk of violence? The

first four factors were culled from case law; the fifth was added as a matter of first impression. (*Clark*, *supra*, 63 Cal.4th at pp. 618-622.)

With respect to the latter factor, the court explained: "If the evidence supports an argument that defendant engaged in efforts to minimize the risk of violence in the felony, defendant may raise that argument and the appellate court shall consider it as being part of all the relevant circumstances that considered together go towards supporting or failing to support the jury's finding of reckless indifference to human life. But the existence of evidence that defendant made some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life . . . ." (*Clark*, *supra*, 63 Cal.4th at p. 622.) This is because, as noted above, recklessness has both subjective and objective elements. Thus, "a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life under *Tison*." (*Ibid.*)

Applying these factors, the court held the evidence did not support a conclusion the defendant was recklessly indifferent to human life. The court explained while the defendant knew a gun would be used, that fact alone is insufficient to establish reckless indifference. The only gun used during the attempted robbery was carried by Ervin, not the defendant, and that gun was loaded with only one bullet. (*Clark*, *supra*, 63 Cal.4th at pp. 618-619.) Unlike *Tison*, where the Tison brothers were "physically present during the entire sequence of events culminating in the murders," and were therefore presented with "an opportunity to act as a restraining influence on murderous cohorts," the defendant in *Clark* was in his car in the parking lot when the victim was shot and was not provided with such an opportunity. (*Id.* at p. 619.) Acknowledging "[t]he jury may have inferred that [the defendant] was aware [the victim] had been shot when he drove from the scene," indicating a "desire to flee the scene as quickly as possible, without regard for [the] welfare . . . of the shooting victim," the court nevertheless distinguished this level of

20

culpability from that of the Tison brothers because, "unlike in [*Tison*], defendant would have known that help in the form of police intervention was arriving." (*Id*. at p. 620.)

With respect to duration of the interaction between victims and perpetrators, the court noted the defendant planned the robbery for closing time, when most employees would be gone, and those who remained would be handcuffed in the bathroom. Thus, while the robbery would take some time to complete, "the period of interaction between perpetrators and victims was designed to be limited." (*Clark*, *supra*, 63 Cal.4th at p. 620.) At the same time, the court explained, "[b]ecause the robbery was planned for a public space and involved the prolonged detention of employees, the crime did involve the risk of interlopers, such as [the murder victim] . . . . But overall, the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life." (*Id*. at pp. 620-621.) There was no evidence that Ervin was known to have a propensity for violence or that the defendant had any knowledge of such a propensity. (*Id*. at p. 621.)

Finally, the court considered the defendant's "apparent efforts to minimize the risks of violence," i.e., (1) the robbery was planned for closing time when most employees would be gone, (2) the gun was apparently supposed to have been unloaded, and (3) the gun was loaded with only one bullet (*Clark*, *supra*, 63 Cal.4th at pp. 621-622), and concluded: "Defendant's culpability for [the victim's] murder resides in his role as planner and organizer, or as the one who set the crime in motion, rather than in his actions on the ground in the immediate events leading up to her murder. But also relevant to his culpability as planner, there is evidence that defendant planned the crime with an eye to minimizing the possibilities for violence. Such a factor does not, in itself, necessarily preclude a finding of reckless indifference to human life. But here there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery. Given defendant's apparent efforts to minimize violence and the relative paucity of other evidence to support a finding of

21

reckless indifference to human life, we conclude that insufficient evidence supports the
. . . special[ ]circumstance findings, and we therefore vacate them." (*Id*. at p. 623.)

In *Scoggins*, our Supreme Court reiterated that "[d]etermining a defendant's
culpability under the special circumstances statute requires a fact-intensive,
individualized inquiry." (*Scoggins*, *supra*, 9 Cal.5th at p. 683.) We need not provide as
detailed an overview of that inquiry as applied to Scoggins's case. It will suffice to
recount the concise description provided by our colleagues at the First Appellate District
in *In re Moore* (2021) 68 Cal.App.5th 434 (*Moore*): "Although [Scoggins] planned the
robbery [citation], knew about his confederates' violent tendencies [citation], and
instructed them 'to "beat the shit out of" ' the victim [citation], he did not 'know that a
gun would be used' [citation], 'was not physically present at the crime scene' [citation],
and never instructed his confederates to kill the victim [citation]. Given these mitigating
circumstances, the 'limited' duration of the interaction between the shooter and the
victim [citation], and the location of the robbery 'in a public parking lot during the
daytime' [citation], our high court held that 'the evidence . . . "does not suggest an
elevated risk to human life beyond those risks inherent in an unarmed beating and
robbery" ' [citation]." (*Id*. at p. 450.)

## C.

### *Analysis*

With the foregoing decisions in mind, we now address the sufficiency of the
evidence supporting defendant's special circumstance finding.

" 'In assessing the sufficiency of the evidence, we review the entire record in the
light most favorable to the judgment to determine whether it discloses evidence that is
reasonable, credible, and of solid value such that a reasonable trier of fact could find the
defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in
the evidence and questions of credibility are resolved in favor of the verdict, drawing
every reasonable inference the jury could draw from the evidence. [Citation.] Reversal

on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

However, as *Banks*, *Clark*, and *Scoggins* reveal, when reviewing a special circumstance finding for substantial evidence establishing major participation and reckless indifference to human life, we must carefully assess the various factors in order to determine the defendant's individual level of culpability, as compared to the level of culpability of the defendants in those cases, as well as in *Enmund* and *Tison*.

We also note at the outset that we confine our analysis to the mens rea element of reckless indifference to human life. We express no opinion as to whether or not defendant's participation in this particular armed robbery was substantial enough to be considered "major" within the meaning of *Banks*.

With respect to the reckless indifference element, we find *Moore*, *supra*, 68 Cal.App.5th 434 to be instructive. There, codefendants Russell and Moore, together with an accomplice, stole a car in a mall parking lot, drove through that parking lot in search of someone to rob, and after finding their intended targets, "[o]ne of the defendants— presumably Russell—got out of the stolen car and robbed [the victims] at gunpoint," shooting one of the victims in the chest at close range without any apparent provocation. (*Id*. at p. 440.) The appellate court held Moore "did not act with the requisite reckless indifference to human life." (*Id*. at p. 452.) Assessing the *Clark* factors, the court explained: "Although Moore was aware that Russell had a gun, Moore did not use a gun himself, and there was no evidence he supplied the gun to Russell. . . . [¶] Moore's presence during the robbery also does not support a finding of reckless indifference. Although Moore likely saw Russell rob and shoot [the victim] while he sat in the stolen Mazda, he never left the car. Thus, he was not 'close enough to exercise a restraining effect on the crime or' Russell. [Citations.]" (*Ibid*, fn. omitted.) The court also noted the

23

"short duration of the robbery and the sudden and unprovoked nature of the shooting" (*ibid*.), as well as the lack of evidence that Moore instructed Russell to use deadly force (*ibid*.) or " 'knew of past violent activities on the part of Russell.' " (*Id*. at p. 453, fn. omitted.)  The court further explained that "Moore's decision to drive away with Russell and [their accomplice] immediately after the shooting" did not establish reckless indifference because other people were in the parking lot, so "Moore could have reasonably assumed that help would arrive quickly." (*Id*. at p. 452.)

In addition to the *Clark* factors, the court held an additional relevant factor militated against a finding of reckless indifference:  Moore's youth.  Moore was 16 years old at the time of the shooting.  The court explained:  "It is well recognized that '[c]hildren "generally are less mature and responsible than adults" ' and ' "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" . . . .' [Citation.]  As a result, '[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.' [Citation.]  This is so 'even where a "reasonable person" standard otherwise applies . . . .' [Citation.]  Thus, ' "the background and mental and emotional development of a youthful defendant [must] be duly considered" in assessing his culpability.' [Citation.]" (*Moore*, *supra*, 68 Cal.App.5th at p. 453.)  Based on these observations, the court held:  "To the extent the *Clark* factors discussed *ante* support a finding of reckless indifference for an adult—an issue we do not decide today—those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth.  In particular, we cannot conclude beyond a reasonable doubt that Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Id*. at p. 454, fn. omitted.)

Similarly, in *In re Ramirez* (2019) 32 Cal.App.5th 384 (*Ramirez*), the appellate court held the evidence did not support a finding of reckless indifference to human life where Ramirez, 19 years of age, found two handguns hidden in an abandoned house and

ultimately gave those guns to his two younger cohorts, E. and J., one of whom was a gang member. After loading the guns, the trio rode their bicycles to a grocery store and then around the neighborhood, where they encountered a friend, C., and showed him the guns. (*Id*. at pp. 389-390.) C. suggested " 'jacking' " somebody, the others agreed, and C. ultimately took possession of one of the guns. (*Id*. at p. 390.) While riding around, C. pointed out the location, a bar parking lot, and then the intended target, a truck pulling into that parking lot. Ramirez and E. stayed with the bicycles, apparently across the street, while C. and J. attempted to rob the driver of the truck. Encountering resistance, J. shot the driver, who died in the parking lot as Ramirez and the others fled together on the bicycles. (*Id*. at pp. 390-391.)

Acknowledging that Ramirez supplied the guns, knew they were loaded, agreed to participate in an armed robbery, and was close enough to the location of the shooting to hear and possibly see what was going on, the court explained that there was no evidence Ramirez was involved in any planning activity beyond agreeing to commit a robbery, "after which he simply acquiesced in whatever [C.] said to do." (*Ramirez*, *supra*, 32 Cal.App.5th at p. 404.) The court also rejected the Attorney General's argument that Ramirez "was close enough to exercise a restraining effect on the crime or his colleagues." (*Id*. at p. 405, fn. omitted.) Finally, the court explained, while Ramirez might have known one of his cohorts was a gang member, there was no evidence that he thereby had "knowledge of [their] likelihood of killing." (*Ibid*.) The court concluded: "There is no evidence from which it reasonably can be inferred [Ramirez] harbored a willingness to kill, or to assist his confederates in killing, to achieve the goal of robbing someone, or that he anticipated the potential for loss of human life beyond that usually accompanying an armed robbery." (*Id*. at pp. 405-406.)

We conclude the *Clark* factors similarly preclude a reckless indifference finding in this case. The first *Clark* factor admittedly cuts against defendant. He knew a gun would be used by Curry and personally used a gun of his own, although defendant made sure his

25

was unloaded. However, in discussing this factor, the *Clark* court was careful to point out: "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618.) Still, as the court also acknowledged, "[a] defendant's *use* of a firearm . . . can be significant to the analysis." (*Ibid*.) Thus, the first factor supports a finding of reckless indifference, although we consider defendant's use of the shotgun in this case to be significantly mitigated by his insistence that the gun be unloaded and refusal to participate until it was demonstrated that the shells had in fact been removed. (See *People v. Keel* (2022) 84 Cal.App.5th 546, 559 (*Keel*) [fact that defendant was armed with an unloaded firearm and knew his confederate was armed "only slightly supported" reckless indifference finding because of other mitigating circumstances].)

The second factor also cuts against defendant, but is similarly mitigated in our view. Defendant was physically present at the scene of the murder. But, as the *Clark* court explained, physical presence is "particularly significant" in a case like *Tison*, where the murder was "a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at p. 619.)

Here, the murder was sudden and unexpected. Despite defendant's presence at the scene, there is no evidence that he was in any position to act as a restraining influence on Curry during the mere seconds it took Curry to shoot Thomas. With respect to this factor, this case is very similar to *Keel*, in which our colleagues at the Fourth Appellate District determined the factor was "neutral." (*Keel*, *supra*, 84 Cal.App.5th at p. 560.)

26

There, as here, the defendant "was present at the scene of the shooting, which allowed him to observe [the shooter's] actions and ostensibly gave him at least some chance to act as a moderating force." (*Ibid*.) However, the court also explained: "Given the spontaneity of the robbery in general, and of [the shooter's] conduct in particular, we are not persuaded [the defendant] had a meaningful opportunity to restrain [the shooter] or intervene before he shot [the victim]." (*Ibid*.) Here, although the robbery was not a spontaneous event, Curry's decision to shoot Thomas certainly was.

Moreover, while presence and failure to render aid to the victim was also noted in *Tison*, defendant's flight from the scene is as easily reconcilable with shock and fear as it is with callous indifference. Nor is there any indication in this record that offering aid to Thomas, who was shot twice in the chest, would have done any good. Like *Clark*, and unlike *Tison*, it is "difficult to infer [defendant's] frame of mind concerning [Thomas's] death" from the fact that he ran when Curry pulled the trigger. (*Clark*, *supra*, 63 Cal.4th at p. 620.)

The third factor, duration of the felony, weighs in defendant's favor. There was no "prolonged period of restraint" of Thomas by defendant or Curry, thereby creating " 'a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620.) The plan was simply to rob Thomas when he reached his car. No prolonged detention or restraint was envisioned. And within seconds of the commencement of the robbery, Curry spontaneously decided to shoot him. This factor does not suggest reckless indifference to human life on the part of defendant. (See *Scoggins*, *supra*, 9 Cal.5th at p. 681; see also *Keel*, *supra*, 84 Cal.App.5th at p. 561.) The Attorney General argues otherwise, noting that "Curry spent the entire day of the murder planning the robbery" and defendant had the same amount of time to decide whether or not to participate. But it is not the duration of the planning that matters for this factor. It is the duration of the felony. No one is in danger of being killed while a robbery is being planned. That danger begins once the robbery commences. The longer a robbery takes

to complete, the more danger is involved. Here, the planned robbery was to be short, and the robbery's duration was cut even shorter by Curry's impulsive decision to shoot Thomas.

The fourth factor is whether defendant possessed knowledge of Curry's likelihood of killing. In support of this factor, the Attorney General points to defendant's testimony that he was afraid to say no to Curry because Curry had a gun and defendant therefore felt like he had no choice but to participate in the robbery, as well as another witness's testimony that Curry and defendant had fought on a previous occasion, although defendant testified that he got the better of Curry during that physical exchange. None of this testimony supports a finding that defendant knew Curry was likely to kill Thomas during this particular robbery. This factor weighs in defendant's favor as well.

The final *Clark* factor is defendant's efforts to minimize the risks of violence during the robbery. This factor is either a wash or also weighs in defendant's favor. First, contrary to the Attorney General's position, the evidence does not support a finding that defendant actively engaged in planning activity at all. Like *Ramirez*, defendant acquiesced in Curry's plan to rob Thomas. Nor is there any evidence in this record that defendant's acquiescence was anything but reluctant. And while Curry certainly did not make any efforts to minimize the risks, we also cannot conclude this particular robbery was significantly more dangerous than any other armed robbery. The cases cited by the Attorney General in support of this being a "most dangerous" robbery involve home invasion robberies (see *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089; *People v. Garcia* (2020) 46 Cal.App.5th 123, 146-148), whereas this one was to occur in a parking lot of an apartment complex. Despite Thomas's vocation as a drug dealer, we do not believe that fact alone elevated the risks to the extent that defendant necessarily exhibited reckless indifference by participating. Second, defendant did mitigate the risks that his *personal participation* posed by ensuring that his shotgun was unloaded. Thus, *he* would not be able to shoot Thomas even if the robbery went sideways and the need to defend

28

himself arose. As our Supreme Court has made clear, it is the defendant's "individual culpability" (*Banks*, *supra*, 61 Cal.4th at p. 801) that is at issue here.

We also agree with *Moore*'s conclusion that youth is a relevant factor in this analysis. This factor also weighs against a finding of reckless indifference. While *Moore* involved a minor, and defendant was 18 years old at the time of the shooting, he is still a youthful offender. Indeed, in extending youth offender parole provisions to offenders under the age of 26 when they committed their crimes (see Stats. 2017, ch. 675, § 1), "the Legislature cited '[r]ecent neurological research show[ing] that cognitive brain development continues well beyond age 18 and into early adulthood.' [Citations.]" (*In re Williams* (2020) 57 Cal.App.5th 427, 432.) Defendant's conduct in this case is a prime example. As we explain later in this opinion, there was no actual duress exerted upon defendant by Curry in this case, as that defense is defined in the law. But this does not mean that defendant did not believe he had to join Curry in robbing Thomas unless he could come up with an adequate excuse not to do so. So he came up with one: Curry was planning an armed robbery, and defendant did not have a gun. When a gun was provided to him, and that excuse evaporated, he came up with another excuse: he did not want to participate if the gun was loaded. But when the shells were removed, defendant ran out of excuses and felt he had to participate. And there is no evidence in the record contradicting defendant's account of his thought process. As in *Moore*, even if the *Clark* factors otherwise support a finding of reckless indifference, "we cannot conclude beyond a reasonable doubt that [defendant] was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Moore*, *supra*, 68 Cal.App.5th at p. 454, fn. omitted; see also *Keel*, *supra*, 84 Cal.App.5th at p. 562 [the defendant's "youth bears significantly on his culpability"].)

Also instructive is *In re McDowell* (2020) 55 Cal.App.5th 999 (*McDowell*). Indeed, this case is perhaps the most instructive because it cuts in the other direction, finding sufficient evidence of reckless indifference to human life, in a case the court

acknowledged "may be close to the line." (*Id*. at p. 1015.) There, McDowell and Hutchison planned and executed a home invasion robbery of a drug dealer, Meehan. McDowell was armed with a knife and Hutchison was armed with a handgun when they entered Meehan's home and demanded money and/or drugs. When Meehan said he did not have anything, Hutchison fired a warning shot into the floor. Meehan then told Hutchison to go ahead and kill him. Two guests were also at Meehan's home at the time. One of them told Hutchison not the hurt Meehan, while the other picked up an object and struck McDowell, knocking him down. Meehan then tried to grab Hutchison's gun, causing Hutchison to shoot him twice in the chest. (*Id*. at p. 1005.)

Concluding the evidence supported a finding that McDowell acted with reckless indifference to human life, the court first accepted McDowell's statement that he did not know Hutchison had a gun, but pointed out McDowell himself was armed with a knife, and he necessarily knew Hutchison had a gun at least by the time the warning shot was fired. (*McDowell*, *supra*, 55 Cal.App.5th at p. 1013.) The court also emphasized that McDowell both planned and actively participated in "a crime with a particularly high risk of violence—a home invasion robbery of a drug dealer." (*Ibid*.) The court further found McDowell took no steps to minimize the "obvious risks of lethal violence" such a plan entailed. (*Id*. at p. 1013; see *id*. at p. 1014.) Finally, the court also relied on McDowell's presence at the scene of the murder and failure to take any steps to prevent it. Specifically, when Hutchison fired the warning shot and Meehan responded with a dare, "there was a brief but critical opportunity for McDowell to say or do something to deescalate the situation," but he did not. (*Id*. at p. 1014.) However, as we have already noted, the court also acknowledged "this case may be close to the line" given how fast the events unfolded once McDowell and Hutchison entered the home and the lack of any evidence that McDowell knew Hutchison had a violent past. (*Id*. at pp. 1014-1015.)

Three important factors that existed in *McDowell* do not exist in this case. First, defendant did not participate in planning the robbery of Thomas. He simply went along

with Curry's plan after failing to come up with a good enough excuse to get out of it. Second, as we have already explained, an armed robbery of a drug dealer in an apartment complex parking lot, while admittedly dangerous, does not carry the same "particularly high risk of violence" as a home invasion robbery of a drug dealer, where it is "foreseeable that customers or others could be present . . . and that either the dealer himself or his customers might be armed or high and thus more likely to resist." (*McDowell*, *supra*, 55 Cal.App.5th at p. 1013.) Third, unlike *McDowell*, there was no brief window of opportunity for defendant to intercede to prevent Curry from shooting Thomas twice in the chest. Thomas did not even resist. He initially reached for his waistband, but then put his hands up. Curry fired seconds later, without any apparent provocation. There appears to be nothing defendant could have done to prevent this particular murder once the stage was set for the robbery.

After carefully reviewing the relevant factors, we conclude the evidence is insufficient to establish defendant "harbored a willingness to kill, or to assist [Curry] in killing, to achieve the goal of robbing [Thomas], or that he anticipated the potential for loss of human life beyond that usually accompanying an armed robbery." (*Ramirez*, *supra*, 32 Cal.App.5th at pp. 405-406.)

## D.

### *Remedy*

The special circumstance finding must be vacated as not supported by substantial evidence. "Retrial of the special circumstance allegation is barred." (*Ramirez*, *supra*, 32 Cal.App.5th at p. 406; see also *People v. Lewis* (2008) 43 Cal.4th 415, 509, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918-920; *People v. Perez* (2016) 243 Cal.App.4th 863, 882.) That is the easy part.

The harder part is determining the appropriate remedy for the felony-murder conviction. Because such a conviction also requires proof of reckless indifference to human life, it too must be reversed. However, as stated previously, a felony-murder

31

conviction did not require such proof at the time of defendant's trial. The new elements of major participation and reckless indifference were added by Senate Bill 1437. The general rule is that retrial is permitted where a new element is added to a crime or enhancement after trial, and accordingly the prosecution did not prove the new element at trial. As our colleagues at the Second Appellate District explained in *People v. Figueroa* (1993) 20 Cal.App.4th 65 (*Figueroa*): "Where . . . evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence." (*Id.* at p. 72; see also *People v. Lopez* (2021) 73 Cal.App.5th 327, 343-346 [retrial allowed after Assembly Bill No. 333 (2021-2022 Reg. Sess.) added elements to the gang enhancement in order "to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22"].)

Here, however, the prosecution did attempt to prove major participation and reckless indifference because those elements were required to prove the special circumstance. The evidence fell short with respect to reckless indifference, for reasons already expressed. In these circumstances, it would make no sense to remand the matter to allow the prosecution the opportunity to again try to prove these elements for purposes of the murder charge, while at the same time barring retrial of the special circumstance allegation.

Nevertheless, a different panel of this court held in *Hola*, *supra*, 77 Cal.App.5th 362, "that the availability of retrial based on a retroactive change in the law appears to have been well settled when the Legislature enacted [former] section 1170.95, subdivision (g), permitting a 'challenge on direct appeal' to 'the validity of [a murder] conviction' based on Senate Bill 1437's amendments," and therefore, "the Legislature must not have foreclosed the possibility of retrial . . . ." (*Id.* at p. 373.) *Hola* involved reversal of a murder conviction that was supported by substantial evidence that the defendant aided and abetted a gang-related assault, the natural and probable consequence

32

of which was murder. At the time of trial, this was a valid theory of murder. Not so after Senate Bill 1437. There remained, however, a legally valid theory of murder potentially applicable to the facts of the case, direct aiding and abetting, although the prosecutor "expressly disclaimed the theory of direct aiding and abetting an intentional murder" and "did not argue direct aiding and abetting implied malice murder." (*Hola,* at p. 368.)

We rejected the defendant's argument that retroactive application of Senate Bill 1437 required us to assess whether or not the record supported either of these direct aiding and abetting theories, and if not, reverse the conviction for insufficient evidence. (*Hola*, *supra*, 77 Cal.App.5th at p. 373.) We explained: "A postconviction change in the law invalidating a prosecution theory is the equivalent of a trial error because it means the jury was instructed on a legally invalid theory. [Citations.] Moreover, as our high court has explained, the insufficient evidence rule barring retrial is 'inapplicable' in a situation where the reversal is based on a postconviction change in the law: 'The [insufficient evidence] rule achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] But the incentive serves no purpose when . . . *the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt.*' [Citations.]" (*Id*. at pp. 375-376, fn. omitted.) We concluded retrial on a direct aiding and abetting theory would be permitted without assessing the evidence supporting that alternative theory because the law at the time of trial did not require such evidence in order for the defendant to be convicted of murder: "Whatever the reason for not introducing evidence to support other available theories, the law did not require it, and the prosecution here made its case under the law as it stood at trial." (*Id*. at p. 376.)

Here, while the law did not require proof of major participation or reckless indifference to prove felony murder at the time of defendant's trial, it did require proof of

33

those elements to prove the special circumstance.  Thus, far from having " '*little or no reason*' " (*Hola*, *supra*, 77 Cal.App.5th at p. 375) to produce evidence of these elements, the prosecution had reason to do so.  More importantly, it did do so.  We presume it put forward its best case on these elements and fell short.  While we have no issue with *Hola*'s conclusion on the facts of that case, we conclude it, and the cases on which it relies, are distinguishable.

The felony-murder conviction in this case is not supported by substantial evidence and defendant may not be retried for Thomas's murder under the felony-murder theory.

## II

### *Defense Request to Instruct on Duress*

Defendant contends the trial court prejudicially erred and violated his federal constitutional rights by denying a defense request to instruct the jury on the defense of duress.  We disagree.

Section 26 provides in relevant part that the following persons are not capable of committing a crime:  "Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."  (§ 26, class Six.)

"The defense of duress . . . requires that the threat or menace be accompanied by a direct or implied demand that the defendant commit the criminal act charged."  (*People v. Steele* (1988) 206 Cal.App.3d 703, 706.)  Additionally, the defense applies "only when the [defendant] responds to an immediate and imminent danger" such that he or she "has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent."  (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.)

In accordance with these principles, CALCRIM No. 3402 states:

"The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) acted under duress.  The defendant acted under duress if, because of threat or menace, (he/she)

34

believed that (his/her/ [or] someone else's) life would be in immediate danger if (he/she) refused a demand or request to commit the crime[s]. The demand or request may have been express or implied.

"The defendant's belief that (his/her/ [or] someone else's) life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed.

"A threat of future harm is not sufficient; the danger to life must have been immediate." (CALCRIM No. 3402.)

The trial court refused defense counsel's request to provide this instruction, explaining: "The requirements of [CALCRIM No.] 3402 and of a duress defense require a couple of elements, neither of which is present." The first requirement the trial court found lacking was reasonableness of defendant's purported belief that his life was in danger if he did not participate in the robbery. The second requirement the trial court found lacking was immediacy of the threat.

We agree with the trial court's assessment. Having already set forth the facts of defendant's participation in the armed robbery, including the pressure exerted on him by Curry to not "be a little bitch," we decline to provide an exhaustive recap. We conclude that the evidence does not support a conclusion that defendant reasonably believed his life was in immediate danger if he stood up to Curry and refused to participate.

## III

### *Ineffective Assistance of Counsel*

Defendant also claims his defense counsel provided constitutionally deficient assistance by pursuing a duress defense without first determining whether or not the trial court would instruct the jury on that defense. We are not persuaded.

35

"A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The decision to pursue one defense over another is clearly a tactical decision. (See *People v. Haskett* (1982) 30 Cal.3d 841, 853.) Defendant's trial counsel was not asked for his reasoning with respect to pursuing duress as a defense in this case. We note, however, that counsel informed the trial court on the first day of trial that he intended to call a defense expert who was expected to testify in support of the theory that defendant acted under duress. The next day, counsel told the trial court that he only recently considered duress as a defense, and before then, "[his] whole line of defense from the beginning was another defense." What this previous defense was, and why counsel decided to abandon it, is not revealed by the record, except that counsel began to "sort of question" whether that prior defense theory would "succeed" because he was "always

36

having a problem with it." The trial court expressed some skepticism with respect to "whether a duress defense would lie." However, the following day, the trial court informed counsel that he would be permitted to present evidence supporting a duress defense, including defendant's testimony. The trial court reserved ruling on whether the jury would be instructed on duress, as well as whether the defense expert would be permitted to testify, until it heard all of the evidence supporting such a theory. Ultimately, the expert was not permitted to testify and the jury was not instructed on the defense.

Defendant's testimony essentially admitted all elements of the robbery charge, but also painted defendant in a fairly sympathetic light with respect to his reluctance to participate. As we have already concluded, however, it did not support instruction on duress as a defense. Defendant argues "no competent attorney would have advised his client to testify without knowing if the defense of duress was viable." However, we do not know whether counsel advised defendant to testify. As the Attorney General points out, a criminal defendant has a constitutional right to testify or decline to do so. (See *Harris v. New York* (1971) 401 U.S. 222, 225; *People v. Robles* (1970) 2 Cal.3d 205, 215.) Thus, the record does not reveal whether defendant was testifying on counsel's advice in order to pursue duress as a defense, or whether defendant intended to testify regardless of counsel's advice.

In any event, regardless of whether defendant testified, his statement to police would have been admitted into evidence, and this conveyed the same basic set of facts. On these facts, we are not entirely sure what counsel should have done. Evidence of defendant's guilt on the robbery charge was overwhelming, and we do not use that adjective lightly. We cannot conclude on this record that counsel did not rationally consider duress to be the most viable defense potentially available given defendant's admissions during his police interview. Nor has defendant persuaded this court that there is a reasonable probability of a different result had his trial counsel pursued a different

37

defense strategy.  Defendant's assertion of ineffective assistance of counsel therefore fails.

## IV

### *Additional Assertions of Trial Error*

Defendant further asserts the trial court prejudicially erred and also violated his constitutional rights by declining to instruct the jury that a lack of motive may support a not guilty verdict, and allowing the prosecutor to play defendant's police interview for the jury a second time in its entirety.  We conclude any assumed error was harmless.  As stated previously, defendant's guilt on the robbery charge was overwhelming.  Even if the jury was specifically informed that a lack of motive can support a not guilty verdict, defendant had one:  peer pressure.  He felt obligated to help Curry perpetrate the robbery.  While this circumstance assists him greatly in undermining the sufficiency of the evidence supporting the robbery-murder special circumstance and felony-murder conviction, it does nothing to undermine the robbery conviction.  Instruction on motive would not have altered the outcome.  Nor is there any reason to believe the outcome would have been different had the jury heard defendant's police interview once rather than twice.

## V

### *Cumulative Prejudice*

We also reject defendant's claim that the cumulative prejudicial impact of the foregoing assertions of error requires reversal.  Stated simply, with respect defendant's remaining robbery conviction, any assumed error is harmless whether viewed individually or cumulatively.

## VI

### *Retroactive Application of Senate Bill 620*

Defendant finally contends we must remand for a new sentencing hearing because Senate Bill 620 amended sections 12022.5 and 12022.53 to give the trial court discretion

to strike firearm enhancements in the interest of justice, and this enactment applies retroactively to cases not yet final on appeal.  The Attorney General concedes the issue.  We accept the concession.

Defendant was sentenced in May 2015.  The law at that time did not allow the trial court to strike his firearm enhancement in the interest of justice, but rather required mandatory imposition.  (See former §§ 12022.5, subd. (c) [as amended by Stats. 2011, ch. 39, § 60], 12022.53, subd. (h) [as amended by Stats. 2010, ch. 711, § 5].)  Effective January 1, 2018, Senate Bill 620 amended both sections to provide:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 1.)

In *In re Estrada* (1965) 63 Cal.2d 740, our Supreme Court stated:  "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Id*. at p. 745.)  This includes "acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Ibid*.)  Thus, under *Estrada*, absent evidence to the contrary, we presume the Legislature intended a statutory amendment reducing punishment to apply retroactively to cases not yet final on appeal. (*Id*. at pp. 747-748; *People v. Brown* (2012) 54 Cal.4th 314, 324.)  Our Supreme Court has also applied the *Estrada* rule to amendments giving the trial court discretion to impose a lesser penalty.  (*People v. Francis* (1969) 71 Cal.2d 66, 76.)

The Attorney General concedes the rule of *Estrada* requires retroactive application of Senate Bill 620 to defendant's case, which in turn requires remand for an exercise of

39

discretion under the new enactment. We accept the concession and order the necessary remand.

## DISPOSITION

Defendant's felony-murder conviction is reversed, the special circumstance finding is vacated, and the matter is remanded for resentencing, during which the trial court shall consider whether or not to strike the firearm enhancement in the interest of justice. In all other respects, the judgment is affirmed.


                           /s/_____

                           HOCH, J.


We concur:


/s/_____
HULL, Acting P. J.


/s/_____
DUARTE, J.